1  John R. Parker, Jr,
   California Bar No. 257761
2  **ALMEIDA LAW GROUP LLC**
   3550 Watt Avenue, Suite 140
3  Sacramento, California 95821
   Tel: (916) 616-2936
4  jrparker@almeidalawgroup.com

5  *[Additional Counsel Listed Below]*

6  ***Attorneys for Plaintiff & the Proposed Class***

7            **UNITED STATES DISTRICT COURT**
        **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
8

9  BRIGETTE HOOD, *individually and on*          Case No. 3:24-cv-03548-RS
   *behalf of herself and all others similarly*
10 *situated,*                                   **FIRST AMENDED CLASS ACTION**
                                                 **COMPLAINT:**
11            Plaintiff,
                                                   1. **Violation of CLRA**
12       v.                                        2. **Violation of UCL**
                                                   3. **Violation of FAL**
13 WALMART, INC.,                                  4. **Breach of Express and**
              Defendant.                              **Implied Warranties**
14                                                 5. **Unjust Enrichment**

15                                               **JURY TRIAL DEMANDED**

16

17

18            **FIRST AMENDED CLASS ACTION COMPLAINT**

19        Plaintiff Brigette Hood ("Ms. Hood"), a California citizen, on behalf of herself and all

20 others similarly situated, alleges violations of California's Consumer Legal Remedies Act

21 ("CLRA"), Cal. Civ. Code § 1750, et seq.; California's Unfair Competition Law ("UCL"), Cal.

22 Bus. & Prof Code § 17200, *et seq*; California's False Advertising Law ("FAL"), Cal. Bus. & Prof

23 Code § 17500, et seq; and unjust enrichment against Defendant Walmart Inc. ("Walmart"). This

24 court has jurisdiction pursuant to 28 U.S.C. § 1332. In support of these claims, Ms. Hood states as

25 follows:

26                        **NATURE OF THE ACTION**

27        1.    Walmart, the world's largest company by revenue, routinely misleads consumers and

28 violates the law by inaccurately labeling and advertising its aluminum products as "Made in the

                                        1

USA" and "Made in USA" when the products are not completely processed domestically or made of materials sourced in the United States of America.

2.    Given Walmart's "Made in the USA" claims, consumers expect that all of Walmart's products and its components originate in the USA. But that is not the case—the products have significant foreign input in the form of bauxite, the primary ingredient in aluminum. Almost no bauxite is mined in the USA. The overwhelming majority of the material is mined and significantly processed internationally, then imported from overseas and used to create the products.

3.    Because the main component of Walmart's products is foreign-sourced, consumers are essentially buying foreign composite products. Moreover, because bauxite is processed overseas before being shipped to the USA, Walmart's products are not entirely "Made in the USA." These false representations have been made for the statutory period up to and including at least August 2022.

4.    Walmart makes deceptive claims and misrepresentations on its product labels, falsely implying that the products are American, made in the United States, of American components. Consumers rely on these representations, paying premium prices because they believe Walmart's products are made in the United States from American materials and are therefore more valuable.

5.    Ms. Hood brings this action on behalf of herself, and others similarly situated to rectify these unlawful practices and compensate consumers for the losses incurred by relying on inaccurate labels.

## THE PARTIES

6.    Ms. Brigette Hood is a natural person and citizen of Concord, California and resides in the Northern District of California. Ms. Hood purchased products manufactured and distributed by Walmart from her home using Walmart.com during the four (4) years prior to the filing of this Complaint ("the Class Period") for personal, family or household purposes. Ms. Hood was injured in fact and lost money as a result of Walmart's unlawful labeling.

7.    Defendant Walmart Inc. is a corporation incorporated under the laws of Arkansas and headquartered at 702 SW 8th Street, Bentonville, Arkansas 72716. Upon information and belief, Walmart's address for service of process is 124 West Capitol Avenue, Suite 1900, Little Rock,

1  Arkansas 72201.

2  ## JURISDICTION & VENUE

3      8.    This court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d) because

4  this is a putative class action wherein, upon information and belief, the aggregate amount in

5  controversy exceeds $5,000,000; there are over 100 class members; and minimal diversity

6  requirements are met. See 28 U.S.C. § 1332(d)(2). Ms. Hood is a California citizen, and no

7  defendant is a citizen of California.

8      9.    Venue is proper in the District Court for the Northern District of California pursuant

9  to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Ms. Hood's claims

10  occurred in this judicial district. Ms. Hood purchased the products at issue in the Northern District

11  and was misled by Walmart's inaccurate labeling in this District.

12  ## FACTUAL ALLEGATIONS

13  **A. FTC's Guidance on "Made in USA" Claims**

14      10.    "Made in the USA" and other similar advertising claims are terms of art with legal

15  definitions that guide their proper use. *See, e.g.*, FTC Made in USA Labeling Rule, 16 C.F.R. §

16  323.1(a) (2021) ("The term *Made in the United States* means any unqualified representation, express

17  or implied, that a product or service, or a specified component thereof, is of U.S. origin. . . .").

18      11.    For decades, the FTC's *Enforcement Policy Statement on U.S. Origin Claims* has

19  provided that manufacturers of products made with foreign or recycled materials cannot claim that

20  the products are "Made in the USA" unless the manufacturers can show that the materials used to

21  make the products originate domestically. See FTC "Made in USA" and Other U.S. Origin Claims,

22  62 Fed. Reg. 63756 (Dec. 2, 1997).

23      12.    Codifying its existing guidance into a "restatement rule" which became effective on

24  August 13, 2021, the FTC explained that:

25          it is an unfair or deceptive act or practice . . . to label any product as Made in the

26          United States unless [1.] the final assembly or processing of the product occurs in

27          the United States, [2.] all significant processing that goes into the product occurs in

28          the United States, and [3.] all or virtually all ingredients or components of the product

1     are made and sourced in the United States.

2     16 C.F.R. § 323.2.

3     13.     Even when a manufacturer buys product materials from a U.S. supplier, if those

4 materials themselves are foreign-sourced or made up of foreign-sourced ingredients, the

5 manufacturer may not simply label and advertise its final product as "Made in the USA." *See* "Made

6 in USA" and Other U.S. Origin Claims, 62 Fed. Reg. at 63769.

7     14.     The FTC bases its position on polls of consumers that show that most consumers

8 regard a "Made in the USA" label as meaning that the product—including the materials used in its

9 manufacture—is entirely or nearly entirely made in the USA. *See* FTC Made in USA Labeling Rule,

10 86 Fed. Reg. 37022, 37026 (July 14, 2021).Manufacturers may use qualified "Made in the USA"

11 claims to accurately label products that are manufactured domestically using foreign materials. *See*

12 "Made in USA" and Other U.S. Origin Claims, 62 Fed. Reg. at 63769–70. An example of a

13 compliant qualified claim is a label that states "Made in the USA with globally sourced materials."

14 *Id.*

15     **B. Significant Components of Walmart's Aluminum Products Are Not Domestically**
      **Sourced.**
16
17     15.     Like many large retail and food chains, Walmart sells private brand products, which

18 are less expensive substitutes for name brand goods. Walmart sells its "Mainstays" private brand

19 for its own lines of housewares, including aluminum pans.

20     16.     Similarly, Walmart sells its "Expert Grill" private brand for its line of grilling

21 accessories, including aluminum pans.

22     17.     Walmart represents that its respective products are "Made in the USA." The

23 representations are front and center on the products' labels, juxtaposed with a red, white, and blue

24 stars and stripes graphic.

25     18.     Walmart makes similar representations about the products on its website.

26     19.     All significant processing that goes into Walmart's products does not occur in the

27 United States, and all or virtually all components of Walmart's products are not sourced in the

28 United States, making Walmart's labelling inaccurate, misleading, and unlawful.

**CLASS ACTION COMPLAINT**

20.     The aluminum used to make Walmart's aluminum consumer products is substantially made from the mined mineral bauxite. There is no way to manufacture aluminum for consumer foil, bakeware, or grilling pans and liners except with bauxite.

21.     Aluminum is one of the most abundant metals in the Earth's crust, and one of the most used metals. However, pure aluminum does not occur naturally and producing it is a complex process that can be broken down into three stages.

22.     Stage 1 is bauxite mining. Each year, the world produces around 390 million tons of bauxite rock, and 85% of it is used to make aluminum. Bauxite is rock composed of aluminum oxides along with other minerals and bauxite is the world's primary source of aluminum. Bauxite contains aluminum oxide ($Al_2O_3$), from which aluminum is extracted. On average, 4 tons of bauxite produces approximately 2 tons of aluminum oxide, which then yields 1 ton of aluminum after electrolysis.[1]

23.     Bauxite is typically extracted from the ground in open-pit mines, with just three countries—Australia, China, and Guinea—accounting for 72% of global mine production.[2]

24.     Stage two involves the Bayer Process. In the 1890s, Austrian chemist Carl Josef Bayer invented a revolutionary process for extracting alumina from bauxite. Today—over 100 years later—some 90% of alumina refineries still use the Bayer process to refine bauxite.

25.     There are the four key steps in the Bayer process: 1. Digestion: Bauxite is mixed with sodium hydroxide and heated under pressure. At this stage, the sodium hydroxide selectively dissolves aluminum oxide from the bauxite, leaving behind other minerals as impurities. 2. Filtration: Impurities are separated and filtered from the solution, forming a residue known as *red mud*. After discarding the mud, aluminum oxide is converted into sodium aluminate. 3. Precipitation: The sodium aluminate solution is cooled and precipitated into a solid, crystallized form of aluminum hydroxide. 4. Calcination: The aluminum hydroxide crystals are washed and

---

[1] Peter Bridenbaugh and James Stanley, Aluminum Processing, Britannica https://www.britannica.com/technology/aluminum-processing (last accessed October 16, 2024)
[2] *Id.*

CLASS ACTION COMPLAINT

heated in calciners to form pure aluminum oxide—a sandy white material known as alumina.[3]

26.    The final stage is aluminum production. In order to turn alumina into aluminum it must be smelted. Smelting the alumina involves using steel reduction pots filled with molten electrolytes, where carbon anodes are used to pass an electric current through the electrolyte. Once ready, alumina is added to the surface. The electric current deposits molten aluminum is collected and poured into molds to form ingots.[4]

27.    The United States imports almost all of the bauxite it uses. Domestic bauxite mines contribute less than 5% of the bauxite the United States consumes, and none of the domestically mined bauxite is used to make aluminum for aluminum consumer products. U.S. Geological Survey, E. Lee Bray, *Bauxite and Alumina*, *in 2018 Minerals Yearbook*, at 10.1 (Feb. 2022), https://pubs.usgs.gov/myb/vol1/2018/myb1-2018-bauxite-alumina.pdf.

28.    Tens of millions of metric tons of bauxite are mined each year. The leaders in bauxite production include Australia, China, Brazil, India and Guinea. The United States has small amounts of bauxite ore located in Arkansas, Alabama and Georgia. However, very little mining is done in the United States today.[5]

29.    According to the International Trade Administration, the U.S. Imported 460,306.87 tons of Aluminum from January through July 2024, as shown below.[6]

---

[3] *Id.*

[4] *Id.*

[5] Bauxite 101, The Aluminum Association, https://www.aluminum.org/bauxite-101 (last accessed October 16, 2024)

[6] U.S. Aluminum Import Monitor. International Trade Association, https://www.trade.gov/data-visualization/us-aluminum-import-monitor (last accessed October 16, 2024)

CLASS ACTION COMPLAINT



30.     Imports of Bauxite & Aluminum in the United States increased to 1641.76 million USD in February 2024 from 1333.39 million USD in January of 2024.[7]

31.     Based on U.S. Geological Survey data, and upon information and belief, bauxite used in manufacturing Walmart's aluminum consumer products is imported from abroad. The international sources of bauxite for aluminum production are readily known based on the U.S. Geological Survey's annual and quarterly reports. A handful of countries produce most of the world's supply of bauxite. *See id*.

32.     Companies prefer to buy bauxite that has been processed internationally because it is cheaper to ship processed bauxite to the U.S., and processed bauxite that has been finely ground has a maximized surface area that makes the domestic refining processes more efficient.

33.     To that end, international mines significantly process bauxite to ensure that it is consistent in surface area, quality, and moisture level.

34.     Bauxite is crushed initially, then cleaned to remove excess, less valuable material,

---

[7] United States Imports of Bauxite and Aluminum, Trading Economics, https://tradingeconomics.com/united-states/imports-of-bauxite-aluminum (last accessed October 16, 2024)

CLASS ACTION COMPLAINT

then dried. During this process the bauxite is screened multiple times, transported multiple times, and crushed again before being shipped to the United States.

35.    Some bauxite is put through a grinding process and transformed into a substance that is finer than sand to be primed for further chemical processing the U.S.

36.    Even more extensive refinement of bauxite may occur overseas depending on importers' contracts with mining companies. Some companies, like Defendant instead prefer to import more refined or processed material.

37.    Foreign bauxite makes up a significant portion of Walmart's products by cost of production of the product and/or final composition of the product.

38.    In order to develop its aluminum products, Walmart imports refined foreign bauxite or other imported products that contain refined foreign bauxite in order to create its aluminum foil products.

39.    The high level of foreign input into Walmart's products conflicts with the expectations of American consumers when they purchase a product bearing a "Made in the USA" label.

40.    Walmart cannot label its aluminum products with an unqualified "Made in the USA" claim given the products' significant foreign bauxite content.

41.    Walmart's misleading representations are directed at consumers seeking to purchase products with the American pedigree. The red, white, and blue stars and stripes image combined with the "Made in the USA" reference on the label means to the reasonable consumers that the product is an American product, of better American quality, of the United States, made in the United States, from United States sourced materials, or all of the foregoing.

42.    Manufacturers, like Walmart, are aware of the connotations of these labels. They promote their products as superior, expressly or impliedly, because they originate from the United States. The perception that Walmart's American-made products are more valuable induces consumers to purchase Walmart's products at a premium price.

43.    American consumers, like Ms. Hood, are more likely to buy products that are marketed as "Made in the USA." Consumers place higher value on U.S.-made products because

they believe such products provide American jobs and support the U.S. economy. Consumers also believe that "Made in the USA" labelling implies higher grade components or ingredients, so they are willing to spend more money on products that are marketed as American-made.

44.    Walmart intentionally uses the "Made in the USA" label because it believes that label works to influence consumers to purchase its products. If the "Made in the USA" claim on Walmart's labels did not give its product a competitive advantage in the market, Walmart would not use the labels.

45.    Walmart capitalized on misleading and deceiving purchasers of its products to get an unfair business advantage when competing with its marketplace peers.

46.    Consumers like Ms. Hood are deceived by Walmart's misrepresentations and are harmed by overpaying for a material feature or benefit advertised on the product labels that they do not receive

**C. Walmart's Product Violates Section 17533.7 of the California Business and Professions Code (BPC)**

47.    Section 17533.7 of California's Business and Professions Code makes it unlawful to advertise products as "Made in the U.S.A." or "Made in America" if the product or "any article, unit, or part thereof" has been "entirely or substantially" manufactured or produced outside of the United States.

48.    In 2016, acknowledging the evolving complexity of global trade, the California legislature created two safe harbors for manufacturers in Section 17533.7. Specifically, the provision now includes two thresholds below which a product may be labeled "Made in the U.S.A" lawfully while including (a) foreign inputs comprising no more than 5 percent of the final wholesale value of the manufactured product or (b) foreign inputs comprising no more than 10 percent of the final wholesale value of the manufactured product *and* the manufacturer can show that it cannot produce nor obtain the foreign input from a domestic source. *See* Cal. Bus. & Prof. Code § 17533.7(c)(1).

49.    Walmart's products fall outside of Section 17533.7(c)(1)'s safe harbors.

50.    There is no way to manufacture aluminum for foil, consumer bakeware, grilling and liners, except with bauxite, nearly 99% of which is mined outside the United States.  Less than 1%

CLASS ACTION COMPLAINT

of aluminum manufacturing is supplied by United States bauxite mines.  Since 1981, none of the bauxite mined in the US was used to make metallic aluminum (for foil).[8]

51.    According to U.S. Geological Survey Data, the production cost of aluminum is broken down into the steps noted *supra*. The overall cost to produce 1 ton of aluminum can range from $1,500 to $2,000 depending on factors such as energy costs and production efficiency.

52.    The wholesale price of bauxite fluctuates but typically ranges from $30 to $50 per ton. Adding in the price of production, bauxite costs $2000 per ton of aluminum.[9] 1 ton is equal to 1,000 kilograms, therefore the cost of bauxite per kilogram (kg) is $2 per kilogram.

53.    A typical aluminum pie pan, such as those sold by Defendant and purchased by plaintiff sized at 8.75x1.16 in diameter, weighs around 50 grams (or 0.05 kg). For a pack of three, the total weight is 0.15 kg of aluminum.

54.    Using the conversion ratio of 4 tons of bauxite for 1 ton of aluminum, the amount of bauxite required to manufacture these pans is 0.60 kilograms (0.15kg of aluminum multiplied by 4). The production cost of aluminum is approximately $2 per kilogram. Therefore, for 0.15 kilograms of aluminum the total cost of production is 0.15kg multiplied by 2USD/kg, which equals $0.30 USD.

55.    The average retail price of a 3-pack of pie pans is approximately $4.00.[10] Given that wholesale prices are generally about 50% to 60% of retail prices, the wholesale price of this pan is approximately $2.00.

56.    The safe harbor rule provides that the foreign input must be less than 5% of the wholesale value of the product.

57.    5% of the wholesale price of this product is $0.10 USD (5% of $2.00).

58.    The total bauxite production cost ($0.30) exceeds 5% of the approximate wholesale

---

[8] National Minerals Information Center, Bauxite and Alumina Statistics and Information, US Geological Survey, https://www.usgs.gov/centers/national-minerals-information-center/bauxite-and-alumina-statistics-and-information (last accessed October 16, 2024)

[9] *Id.*

[10] Walmart.com, Handi-Foil Heavy Duty Aluminum pan, 9-inch diameter, 3-count at $3.98. https://www.walmart.com/ip/Handi-Foil-Heavy-Duty-Aluminum-Pie-Pan-9-inch-Diameter-3-Count/451063024?classType=REGULAR&athbdg=L1102&from=/search

price ($0.10).

59.     Because the percentage of foreign material in aluminum exceeds the allowable amount, Walmart has violated Section 17533.7 of the Business and Professions Code.

**D. Ms. Hood's Facts.**

60.     Ms. Hood is a consumer who regularly purchases aluminum products for her personal, family, or household purposes

61.     In or around August of 2022, Ms. Hood, relying on the "Made in the USA" labels and the flag-like graphics on the packages, purchased Mainstays aluminum pie pans, round and square cake pans, and cake pans with lids, as well as Expert Grill aluminum grease tray liners, because she believed the products were actually made in the United States out of materials sourced in the United States.

62.     Specifically, Ms. Hood purchased Mainstays 3-pack of 8.75x1.16 Pie Pans, Mainstays 3-pack of 8.5x1.5 Cake Pans, Mainstays 2-pack of 8x1.47 Cake Pans, Mainstays 4-Piece of 12.75x9 Cake Pans with Lids, and Expert Grill 3-Pack of Grease Tray Liners. She purchased these products for a total of $8.05.

 

CLASS ACTION COMPLAINT



63.     The fact that the products were represented as being "Made in the USA" was an important consideration for Ms. Hood in purchasing Walmart's products. She understood "Made in USA" to mean the raw materials for the Product were converted and transformed in the U.S.A., and the raw materials were sourced within this country.

64.     At the time Ms. Hood purchased the products, Ms. Hood did not know, and had no reason to know, that Walmart's claims were misleading and unlawful as set forth herein. Ms. Hood believed the products were made in the USA, as they were labelled, which she understood to mean that not only were the raw materials for the product converted and transformed in the United States but also that the raw materials were sourced domestically.

65.     Ms. Hood paid more for the products than she would have had she known that the materials used to make them were not sourced from the United States, but from overseas, and that significant processing of the products occurred overseas.

66.     Defendant's labeling, advertising and marketing as alleged herein is false and misleading and was designed to increase sales of the products at issue. Defendant's misrepresentations are part of an extensive labeling, advertising and marketing campaign, and a reasonable person would attach importance to Defendant's misrepresentations in determining whether to purchase the products at issue.

67.     As a result of Defendant's unlawful and misleading claims, Ms. Hood and thousands of similarly situated consumers purchased the products at issue.

68.    Ms. Hood bought the Product because she expected it was "Made in U.S.A.," understood to mean the raw materials for the Product were converted and transformed in the U.S.A., and the raw materials were sourced within this country, because that is what the representations said and implied.

69.    Ms. Hood relied on the words, layout, packaging, and images on the Product label in deciding to purchase the Product, including the "Foil Made in U.S.A." followed by three stars representation.

70.    Ms. Hood is one of the many Americans who seeks to buy American.

71.    Ms. Hood trusted the  Mainstays brand, because it is distributed and made by Walmart Inc.

72.    Ms. Hood did not expect a product, especially from Walmart, would promise it was "Foil Made in U.S.A." followed by three stars even though all or virtually all of the raw materials used were from outside of the United States and a substantial amount of the making, manufacturing, and/or production of the aluminum foil Product took place outside of the United States.

73.    The "Made in U.S.A." claim was deceptive because in fact, all or virtually all of the raw materials used in the Product were from outside of the United States, and a substantial amount of the making, manufacturing, and/or production of the aluminum foil Product took place outside of the United States.

74.    Ms. Hood would not have purchased the Product if she knew the "Made in U.S.A." followed by three stars representations and omissions were false and misleading, or she would have paid less for it.

75.    Ms. Hood chose between Defendant's Product and products represented similarly, but which did not misrepresent their attributes, features, and/or components.

76.    The Product was worth less than what Hood paid, and she would not have paid as much but for the Defendant's false and misleading statements and omissions.

77.    Ms. Hood intends to, seeks to, and will purchase the Product again when she can do so with the assurance that the Product's "Foil Made in U.S.A." followed by three stars representations are consistent with its composition, sourcing, and manufacture, and are therefore

1  truthful and non-misleading.

2      78.   Ms. Hood is unable to rely on the ongoing labeling and representations that the

3  Product is "Foil Made in U.S.A." followed by three stars because she is unsure whether those

4  representations are truthful.

5      79.   Ms. Hood on her own behalf, and on behalf of the putative Class members, notified

6  Walmart of the violations alleged herein. Despite giving Walmart more than 30 days from the date

7  of the notification letters (original letter sent September 2022 and supplemental sent August 2023

8  after being in touch with counsel for Defendant) to provide appropriate relief for the violations and

9  claims alleged herein, Walmart failed to provide any such relief.

10                          **CLASS ACTION ALLEGATIONS**

11     80.   Ms. Hood brings this action on behalf of the following class of persons (the "Class"),

12  subject to modification after discovery and case development:

13              All persons in the State of California who, within four years prior to the filing of this

14              Complaint, purchased Walmart's aluminum products which were labeled as being

15              "Made in the USA."

16     81.   Excluded from the class are Defendants, any entities in which Defendants have a

17  controlling interest; their agents and employees; and any Judge to whom this action is assigned and

18  any member of such Judge's staff and immediate family.

19     82.   Ms. Hood proposes that she serve as class representative.

20     83.   Ms. Hood and the Class have all been harmed by the actions of Defendant.

21     84.   Numerosity is satisfied. While the exact number of Class members is presently

22  unknown, and can only be ascertained through appropriate discovery, Ms. Hood believes the number

23  of Class members are in the thousands of persons, if not more. Individual joinder of these persons

24  is impracticable.

25     85.   There are questions of law and fact common to Ms. Hood and to the Class that

26  predominate over any questions affecting only individual Class members, including, but not limited

27  to:

28              a.   Whether Defendants engaged in unfair or deceptive business practices by advertising

                                      14

and selling their products;

b. Whether Defendant made unlawful and misleading claims regarding the origin of manufacture of their products;

c. Whether the products were falsely advertised and misbranded as to their geographic origin of manufacture as a matter of law;

d. Whether Defendants violated the CLRA, UCL, FAL or were unjustly enriched;

e. Whether Ms. Hood and the Class were damaged by Defendants' conduct;

f. Whether Ms. Hood and the Class are entitled to actual and/or statutory damages as a result of Defendants' actions;

g. Whether Ms. Hood and the Class are entitled to restitution;

h. Whether Ms. Hood and the Class are entitled to attorney's fees and costs.

i. Proof of a common set of facts will establish the right of each Class member to recover.

86.    Ms. Hood's claims are typical of the claims of the Class members because Ms. Hood, like the Class members, purchased Defendant's misleading "Made in the USA" labelled products in reliance on that assertion. Defendant's unlawful, unfair and/or fraudulent actions concern the same business practices described herein irrespective of where they occurred or were experienced.  Ms. Hood and the Class sustained similar injuries arising out of Defendant's conduct in violation of California law. Ms. Hood and the members of the Class sustained the same types of damages and losses. Ms. Hood's claims arise from the same course of conduct that give rise to the claims of the Class members and are based on the same legal theories.

87.    Ms. Hood is an adequate class representative because her interests do not conflict with the interests of the Class members, and she will adequately and fairly protect the interests of the Class members. Ms. Hood intends to prosecute this action vigorously and has taken actions before filing this complaint by hiring skilled and experienced counsel and by making a pre-suit demand on behalf of class members to protect the interests of the Class. There is no conflict between Ms. Hood and the proposed class.

88.    A class action is the superior method for fair and efficient adjudication of Ms. Hood's

and the Class members' claims. The likelihood that individual members of the Class will prosecute separate actions is remote due to the time and expense necessary to conduct such litigation. In addition, it is likely that most class members are unaware that they have claims. Finally, the prosecution of separate actions by the individual class members, even, if possible, would create a risk of inconsistent or varying adjudications regarding the individual class members.

89.    There are no difficulties likely to be encountered by the court in the management of this putative class action.

## CAUSES OF ACTION

### COUNT I
### Violation of the California Consumers Legal Remedies Act
### Cal. Civ. Code §§ 1750, *et seq.*

90.    Ms. Hood incorporates the preceding paragraphs as if alleged herein.

91.    California's Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, et seq., provides that "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer are unlawful."

92.    The products are "goods," as defined in California Civil Code section 1761(a).

93.    Defendant is a "person" as defined in California Civil Code section 1761(c).

94.    Ms. Hood and members of the Class are "consumers," as defined in California Civil Code section 1761(d).

95.    Purchase of the products by Ms. Hood and members of the Class are "transactions," as defined in California Civil Code § 1761(e).

96.    Defendant violates section 1770(a)(4), which prohibits the use of "deceptive representations or designations of geographic origin in connection with goods or services," by representing that its products are "Made in the USA" when the materials from which they are manufactured are not sourced in the USA. Walmart cannot label its aluminum products with an unqualified "Made in the USA" claim given the products' significant foreign bauxite content.

97.    Defendant also violates section 1770(a)(5) by representing that the products have "characteristics, . . . uses [or] benefits . . . which [they] do not have" in that Defendant uses "Made

CLASS ACTION COMPLAINT

in the USA" on the products' labels but the products are not from, of, or by the United States; instead they are from foreign sources.

98.     Similarly, Defendant violates section 1770(a)(7) by representing that the products "are of a particular standard, quality, or grade . . . if they are of another" by advertising they are from, by, of or related to America. Walmart's products do not actually have those qualities, and consequently they are misrepresented. Similarly, Walmart's assertion that its products are "Made in the USA" is an expressly stated feature that consumers often will pay more for, and the products did not actually have that feature.

99.     Lastly, Defendant violates section 1770(a)(9) by advertising the products "with intent not to sell them as advertised" due to deceptive statements and claims that the products are "Made in the USA" of domestic components when they were not.

100.     Ms. Hood and the members of the Class reasonably and justifiably relied on Defendant's misrepresentations in purchasing the products. Had the products been honestly advertised and labeled, Ms. Hood and members of the Class would not have purchased them and/or would have paid less for them.

101.     As a proximate and direct result of Defendant's conduct, Ms. Hood and members of the Class have been injured and suffered damages by purchasing one or more of the products that feature false and/or misleading labeling. Likewise, Defendant has unreasonably profited from its conduct.

102.     Given that Defendant's conduct violated section 1770(a)(5), Ms. Hoods and members of the Class are entitled to and seek injunctive relief to put an end to Defendant's violations of the CLRA.

103.     Moreover, Defendant's conduct is malicious, fraudulent, and wanton in that Defendant intentionally misled and withheld material information from consumers to increase the sale of the products.

104.     Pursuant to California Civil Code § 1782(a), Ms. Hood on her own behalf, and on behalf of members of the Class, notified Defendant of the alleged violations of the CLRA. Despite giving Walmart more than 30 days from the date of the notification letter to provide appropriate

relief for violations of the CLRA, Defendant has failed to provide any such relief. As such, Ms. Hood also seeks compensatory, monetary and punitive damages, in addition to equitable and injunctive relief, and requests that this Court enter such Orders or judgments as may be necessary to restore to any person in interest any money which may have been acquired by means of such unfair business practices, and for such other relief as provided in California Civil Code section 1780 and in the Prayer for Relief.

105.    Ms. Hood also requests that the Court enjoin Defendant from continuing to employ the unlawful methods, acts and practices alleged herein pursuant to section 1780(a)(2).

**COUNT II**
**Violation of California's Unfair Competition Law**
**Cal. Bus. & Prof. Code §§ 17200, *et seq.***

106.    Ms. Hood incorporates the preceding paragraphs as if alleged herein.

107.    California's Unfair Competition Law (UCL), Cal. Bus. & Prof. Code §§ 17200 et seq., protects consumers by holding companies liable for unfair competition and unlawful business practices.

108.    The UCL provides a private right of action to any person who has suffered injury in fact and, as a result of unfair business practices, has lost money or property. Cal. Bus. & Prof. Code § 17204.

109.    The UCL broadly applies to any corporation that engages in unfair competition. *Id.* §§ 17200, 17201.

110.    The UCL defines unfair competition to include any "unlawful, unfair, or fraudulent" business act or practice. *Id.* § 17200.

111.    A business act or practice is "unlawful" under the UCL if it violates any other law or regulation. The UCL's coverage is "sweeping, embracing anything that can properly be called a business practice and that at the same time is forbidden by law." *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 973 P.2d 527, 539 (Cal. 1999).

112.    Because the UCL's definition of unfair competition includes any unlawful business act or practice, the statute "borrows violations of other laws and treats them as unlawful practices" that are independently actionable under the UCL. *Id.* at 539–40. Accordingly, Defendant's

18

violations of other statutes including, without limitation, violations of the CLRA and FAL as alleged herein, are all actionable under the UCL.

113.    Defendant's conduct constitutes unfair and/or fraudulent business acts and practices because Defendant made false representations to Ms. Hood and members of the Class that were likely to deceive Ms. Hood and members of the Class into purchasing Defendant's products. Defendant misrepresented and made false statements that the products were "Made in the U.S.A.," when they were not. Walmart cannot label its aluminum products with an unqualified "Made in the USA" claim given the products' significant foreign bauxite content.

114.    Defendant is aware that the claims or omissions they make about the products are and continue to be false and misleading.

115.    Defendant had an improper motive—to derive financial gain at the expense of accuracy or truthfulness—in its practices related to the labeling of its products.

116.    Defendant's conduct was, and continues to be, unfair, in that its injury to countless purchasers of the products is substantial and is not outweighed by any countervailing benefits to consumers or to competitors.

117.    There were reasonable alternatives available to Defendant to further Defendant's legitimate business interests other than the conduct described herein.

118.    Moreover, Ms. Hood and members of the Class could not have reasonably avoided such injury, given that Walmart failed to disclose the products' true characteristics at any point.  Ms. Hood and members of the Class purchased the products in reliance on the representations made by Walmart, as alleged herein.

119.    As a result of the above conduct, Ms. Hood has suffered economic injury, and Defendant has been unjustly enriched at the expense of Ms. Hood and members of the Class through the monies paid to Walmart for the products that lacked the characteristics advertised, interest lost on those monies, and its unwitting support of a business enterprise that promotes deception and undue greed to the detriment of consumers.

120.    As a result of the business acts and practices described above, Ms. Hood and members of the Class, pursuant to section 17203 of the UCL, are entitled to an Order enjoining such

1    future wrongful conduct on the part of Walmart and such other Orders and judgments that may be

2    necessary to disgorge Defendant's ill-gotten gains and to restore to any person in interest any money

3    paid for the products as a result of the wrongful conduct of Defendant.

4        121.    Pursuant to California Civil Code section 3287(a), Ms. Hood and the Class are further

5    entitled to pre-judgment interest as a direct and proximate result of Defendant's unfair and

6    fraudulent business conduct. The amount on which interest is to be calculated is a sum certain and

7    capable of calculation, and Ms. Hood and the Class are entitled to interest in an amount according

8    to proof.

9                                    **COUNT III**
                          **Violation of the California False Advertising Law**
10                          **Cal. Bus. & Prof. Code §§ 17500–17606**

11        122.    Ms. Hood incorporates the preceding paragraphs as if alleged herein.

12        123.    California's False Advertising Law (FAL), Cal. Bus. & Prof. Code §§ 17500 et seq.,

13    prohibits unfair, deceptive, untrue or misleading advertising.

14        124.    Defendant violated the FAL when it represented through false and misleading

15    advertising and through other express representations that the products were "Made in the USA"

16    when they were not. The aluminum products, given their significant foreign content, cannot be

17    labelled with an unqualified "Made in the USA" claim. Defendant misled consumers to believe that

18    its products possessed quality, characteristics, and value that they did not actually have.

19        125.    This conduct particularly violates California Business and Professional Code section

20    17533.7(a), which makes it unlawful to sell merchandise labelled with "Made in U.S.A.," "Made in

21    America," "U.S.A.," or other similar expressions "if the merchandise or any article, unit, or part

22    thereof, has been entirely or substantially made, manufactured, or produced outside of the United

23    States."

24        126.    All of the articles, units, or parts of Defendant products that are obtained from outside

25    the United States constitute more than 10% of the final wholesale value of the manufactured

26    products.

27        127.    Defendant's deceptive practices were specifically designed to induce Ms. Hood and

28    Class members to purchase the products. Defendant engaged in marketing efforts to reach Ms. Hood

and Class members and were successful in persuading Ms. Hood and Class members to purchase the falsely advertised products. Ms. Hood and Class members purchased the products in reliance on Defendant's false and misleading statements.

128.    Ms. Hood and Class members would not have purchased Defendant's products had it not been for Defendant's misrepresentations of material facts. Ms. Hood and Class members were denied the benefit of the bargain when they decided to purchase Defendant's products over competitor products. Had Ms. Hood and Class members been aware of the false and misleading advertising tactics, they would have paid less than what they paid for the products, or they would not have purchased them at all.

129.    The above acts of Defendant, in disseminating misleading and deceptive representations and statements throughout California to consumers, including Ms. Hood and Class members, were and are likely to deceive reasonable consumers in violation of the FAL.

130.    In making and disseminating the statements alleged herein, Defendant knew or should have known that the statements were untrue or misleading, and acted in violation of the FAL.

131.    Defendant continues to engage in unlawful, unfair and deceptive practices in violation of the FAL to induce consumers to purchase its products.

132.    As a direct and proximate result of Defendant unlawful conduct in violation of the FAL, Ms. Hood and Class members, pursuant to section 17535, are entitled to an Order of this Court enjoining such future wrongful conduct on the part of Defendant and requiring Defendant to disclose the true nature of its misrepresentations.

133.    Ms. Hood and Class members also request an Order requiring Defendant to disgorge its ill-gotten gains and/or award full restitution of all monies wrongfully acquired by Defendant by means of such acts of false advertising, plus interests and attorneys' fees.

**COUNT IV**
**Breach of California Express and Implied Warranties**
**Cal. Com. Code §§ 2313, 2314**

134.    Ms. Hood incorporates the preceding paragraphs as if alleged herein.

135.    Defendants' products were manufactured, identified, and sold by Defendant and expressly and impliedly warranted to Ms. Hood and Class members as "Made in the USA," which

Ms. Hood and Class members reasonably understood to mean that not only were the raw materials for the products converted and transformed into the final products in the United States, but that the raw materials for the products were also sourced within the United States.

136. Defendant had a duty to disclose and/or provide non-deceptive descriptions and marketing of the Product.

137. Defendant made promises and affirmations of fact through the sale of its products constituting warranties when they advertised and sold its aluminum products with the words "Made in the USA" on the labels. Ms. Hood and Class members relied on these promises and affirmations and they became part of the basis of the bargain between Ms. Hood and Class members and Walmart.

138. Defendant, through its marketing and product labels, created express and implied warranties that the products were actually "Made in the USA."

139. Defendant is a merchant with respect to the sale of the products. Therefore, a warranty of merchantability is implied in every contract for sale of the products to Ms. Hood and Class members.

140. Despite Defendant's express and implied warranties about the origin of the products, the quality and characteristics of the products were not as Walmart represented them to be. The aluminum products, given its significant foreign bauxite content, cannot be labelled with an unqualified "Made in the USA" claim. The products did not conform to its affirmations of fact and promises due to Defendant's deceptive and misleading actions.

141. Defendant breached its express warranties and the implied warranty of merchantability because its products did not conform to the promises or affirmations of fact made on the labels. *See* Cal. Com. Code §§ 2313, 2314(2)(f).

142. Defendant breached its express and implied warranties about the origin of its aluminum products. Defendant knew the product attributes that potential customers like Ms. Hood were seeking and developed its marketing and labeling to directly meet those needs and desires. *See id.*

143. As a direct and proximate result of Defendant breach of warranties, Ms. Hood and

Class members were harmed in the amount of the purchase price they paid for the products. Further, Ms. Hood and Class members have suffered and continue to suffer economic losses and other general and specific damages including, but not limited to, the amounts paid for the products, and any interest that would have accrued on those monies, in an amount to be proven at trial.

**COUNT V**
**Unjust Enrichment**

144.    Ms. Hood incorporates the preceding paragraphs as if alleged herein.

145.    In the event Ms. Hood and Class members lack adequate remedies at law for the past, present, and future injuries Defendant has inflicted, Ms. Hood seeks equitable relief on behalf of herself and all others similarly situated.

146.    As alleged herein, Defendant has intentionally and recklessly made misleading representations to Ms. Hood and Class members to induce them to purchase its products. Ms. Hood and Class members have reasonably relied on the misleading representations and have not received all of the benefits promised by Defendant. Ms. Hood and Class members therefore were induced by Defendant's misleading and deceptive representations about the products and paid more money to Defendant for the products than they otherwise would and/or should have paid.

147.    Ms. Hood and Class members have conferred a benefit upon Defendant as they have retained monies paid to them by Ms. Hood and Class members.

148.    The monies received were obtained under circumstances that were at the expense of Ms. Hood and Class members because Ms. Hood and Class members did not receive the full value of the benefit conferred upon Defendant.

149.    Therefore, it is inequitable and unjust for Defendant to retain the profit, benefit, or compensation conferred upon it without paying Ms. Hood and Class members back for the difference of the full value of the benefits compared to the value actually received.

150.    As a direct and proximate result of Defendant's unjust enrichment, Ms. Hood and Class members are entitled to restitution, disgorgement, and/or the imposition of a constructive trust upon all profits, benefits, and other compensation obtained by Defendant from its deceptive, misleading, and unlawful conduct as alleged herein.

## **PRAYER FOR RELIEF**

WHEREFORE, Ms. Hood, on behalf of herself and others similarly situated, respectfully requests that this Honorable Court:

A.  Certify the proposed Class;

B.  Appoint Ms. Hood as class representative and Ms. Hood's counsel as class counsel;

C.  Temporarily and permanently enjoin Defendant from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

D.  Award damages, including compensatory and exemplary damages, to Ms. Hood and the Class in an amount to be determined at trial;

E.  Award statutory damages and/or penalties to Ms. Hood and the Class;

F.  Award punitive damages;

G.  Award Ms. Hood and the Class its expenses and costs of suit, including reasonable attorneys' fees to the extent provided by law;

H.  Award pre-and post-judgment interest to the extent provided by law; and

I.  Award such further relief as the Court deems just and proper.

Dated: October 21, 2024                     Respectfully Submitted,

**ALMEIDA LAW GROUP LLC**

/s/ John R. Parker, Jr.
John R. Parker, Jr. (SBN 257761)

**PEIFFER WOLF CARR
KANE CONWAY & WISE, LLP**

Brandon M. Wise*
Domenica M. Russo*
One US Bank Plaza, Suite 1950
St. Louis, MO 63104
bwise@peifferwolf.com
drusso@peifferwolf.com

*admitted pro hac vice

*Attorneys for Plaintiff & the Proposed Class*

CLASS ACTION COMPLAINT

**DECLARATION OF JOHN R. PARKER, JR.**
**PURSUANT TO CALIFORNIA CIVIL CODE § 1780(d)**

I, John R. Parker, Jr., declare as follows:

1.    I submit this declaration pursuant to section 1780(d) of the California Consumers Legal Remedies Act.  I have personal knowledge of the matters set forth below and if called as a witness could and would be competent to testify thereto.  I am one of the attorneys representing Plaintiff and the putative class in this matter.

2.    Defendant Wal-Mart is doing business in the Northern District of California.

3.    Plaintiff Ms. Brigette Hood resides in the Northern District of California.  Plaintiff purchased Defendant's products in this District and viewed Defendant's labels in this District.  Her claims are typical of those of the Class she seeks to represent in this action.

4.    This action was commenced in the United States District Court for the Northern District of California.

I declare under the penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct, and that this declaration was executed on October 21, 2024 in Sacramento, California.

*/s/ John R. Parker, Jr.*